# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KELLIE HUDSON,<br>712 Hamlin St. NE,<br>Washington, DC 20017,<br><br>    Plaintiff,<br><br>        v.<br><br>ASHTON B. CARTER, Secretary,<br>United States Department of Defense,<br>1000 Defense Pentagon,<br>Washington, DC 20301-1000,<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kellie Hudson ("Hudson"), by and through the undersigned attorney, hereby states that:

### INTRODUCTION

1. Plaintiff Kellie Hudson ("Hudson") sues the United States Department of Defense ("the Agency") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), on the grounds that the Agency discriminated against Hudson based upon her gender (female) while Hudson served as an officer with the Pentagon Police Department ("PPD"), a component of the Pentagon Force Protection Agency ("PFPA").  The Agency violated Title VII both through egregious sexual harassment perpetrated by a PPD supervisor, Sergeant James Jacobs ("Jacobs"), and by retaliating against Hudson after she made an Equal Employment Opportunity ("EEO") claim based on Jacobs' conduct.

## JURISDICTION AND VENUE

2. The Court has subject matter jurisdiction of this action pursuant to Section 703(a)(1) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (extending Title VII to federal employees) and 42 U.S.C. § 2000e-5(f)(3) (conferring jurisdiction over Title VII lawsuits to all United States district courts); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1343 (civil rights).

3. Venue for this case lies within the District of Columbia, pursuant to 42 U.S.C. § 2000e-5(f)(3):  (1) The unlawful employment practices were committed at the Pentagon, which considers an address within the District of Columbia to be its mailing address notwithstanding the Pentagon's physical location within the Commonwealth of Virginia; (2) the employment records relevant to the subject matter of this complaint are maintained and administered in the District of Columbia and are also available electronically within the District of Columbia; (3) Hudson would have worked as a PPD officer at the United States Court of Appeals for the Armed Forces located at 450 E St NW in Washington, DC 20442, but for the Agency's retaliation against Hudson after she filed her initial complaint against Jacobs; and (4) the Agency has its principal office in the District of Columbia, based on the Agency's mailing address.

## PARTIES

4. Hudson is a resident of Washington, DC.  At the time of the employment-related actions complained of herein, Hudson was employed by the PPD within the PFPA, which is a constituent part of the Agency entrusted with the protection of the Pentagon.

5. Ashton B. Carter is Secretary of the Agency. The Agency is an executive agency, department, or instrumentality of the federal government, subject to the laws of the United States of America. Hudson sues Secretary Carter in his official capacity only.

## STATEMENT OF FACTS

6. On or about August 3, 2009, Hudson was hired by the Agency to serve as a Federal Police Officer with PPD. For approximately the next six months, Hudson received in-house training and graduated from the Uniform Police Training Program offered at the Federal Law Enforcement Training Center located in Glynco, Georgia.

7. In or around the beginning of March 2010, Hudson began her first regular tour of duty with PPD. From that date until May 19, 2012, when Hudson was unjustly terminated, Hudson performed all of her duties at a more than satisfactory level, as reflected by the fact that she received a bonus at the end of 2010 as well as various certificates of recognition. Additionally, in or around January 2012, despite having been placed on administrative leave as described below, Hudson was honored as employee of the month for PPD.

8. While employed at PPD, Hudson also was one of approximately 10 out of over 400 non-supervisory Federal Police Officers who was granted Top Security clearance for the purpose of working at the National Military Command Center within the Pentagon.

9. PPD is divided into six platoons. Approximately 70 officers are assigned to each platoon at any given time. Hudson began her service with the Sixth Platoon. In or around September 2010, she was transferred to the Fifth Platoon. As of the date of Hudson's transfer to Fifth Platoon, Jacobs acted as one of six first-line supervisors assigned to the Fifth Platoon.

10. On or about February 17, 2011, at approximately 5:15 a.m., as Hudson arrived at her duty station and Jacobs was departing, Hudson noticed Jacobs staring at her. Because Hudson had some Girl Scout cookies in her hand, and was eating a cookie, she asked Jacobs if he wanted a cookie. Jacobs pointed at Hudson's private parts and stated, "I want some of that," or words to that effect. Shocked, Hudson did not know how to respond to such a remark, so she simply walked away.

11. The next day, on or about February 18, 2011, Jacobs called Hudson on a PFPA land line while she was on duty at a work station known as "Metro Pre-Screen," which is located at the entrance to the Pentagon adjoining the Pentagon Metro Station. Jacobs, then acting as Hudsons' supervisor, stated that he wanted to finish the conversation begun the previous day but did not want to talk on the government phone. Hudson explained that visitors were at the front desk, and that she needed to assist them.

12. Following the telephone conversation of February 18, 2011, for the next several weeks, whenever Hudson encountered Jacobs on duty, Jacobs would roll his eyes and make derisive remarks towards Hudson. When other persons were present, whether officers or visitors, Jacobs would make statements belittling Hudson. This conduct from a supervisor embarrassed Hudson and made Hudson feel so uncomfortable that she dreaded coming to work.

13. On March 11, 2011, after a number of encounters during which Jacobs manifested the sort of conduct described above, Hudson confronted Jacobs when Hudson was working a duty station that referred to by PFPA officers as "Metro Push-Out No. 1." Hudson asked Jacobs if she had done anything to offend him or shown any disrespect to him as a supervisor.

14. This question provoked a lengthy lecture from Jacobs that began with Jacobs stating that he was disappointed because Hudson had not stopped smoking cigarettes and ended with Jacobs making an explicit sexual proposition to Hudson and threatening that if Hudson did not satisfy Jacobs' sexual desires, Jacobs would cause serious problems with her law enforcement career, as in fact Jacobs subsequently did. Specifically, Jacobs demanded sexual favors from Hudson in the following words or very similar language:

> There are only two things a woman can do for me. You can give me some head or let me bust a nut. What are you gonna do?

15. In an attempt to calm down and distract Jacobs, Hudson then asked Jacobs if he knew that Hudson was getting married the next month, to which Jacobs replied, "I don't give a fuck."

16. Jacobs then informed Hudson that many officers underestimated him because of his diminutive size, but claimed that he had a "I don't give a fuck" attitude. As evidence of this attitude, Jacobs bragged that he had shot his own brother. Jacobs then warned Hudson that sergeants from different platoons talk about officers under their supervision and that if someone got on his "shit list" they would have problems within PFPA. Jacobs made these comments in order to frighten, intimidate, and cajole Hudson into having sexual relations.

17. At the end of Jacobs' speech to Hudson on March 11, 2011, Jacobs told Hudson that he would be out on March 18, 2011, and he "needed an answer," or words to that effect, no later than March 17, 2011. Hudson understood and believed that the question to which Jacobs needed an answer was whether Hudson would engage in coitus with Jacobs or perform fellatio upon him, no other options–such as refusing Jacobs' demands–having been placed on the table.

18. Hudson was extremely upset by Jacobs' conduct and immediately began planning how she could avoid retaliation once she apprized Jacobs that she did not want to have sex with him. Hudson then resolved to make an immediate complaint against Jacobs.

19. Based upon information then available to her, Hudson understood and believed that the next two persons up the chain of command, namely, Lieutenant Anthony I. Dozier ("Dozier") and Lieutenant Robert D. Fields, II ("Fields"), were friends of Jacobs who in the past had regularly commuted with Jacobs between their homes in Virginia and the Pentagon. Given these personal relationships, Hudson did not trust Dozier and Fields to protect her if she reported Jacobs' harassment to them.

20. On March 14, 2011, Hudson approached Captain Anthony Brisueno ("Brisueno"), whom Hudson trusted, and told Brisueno about her problems with Jacobs. Brisueno informed Hudson that he would be out on March 15, 2011, and asked her to put everything in writing and meet with Brisueno on March 16, 2011. Hudson then prepared a letter dated March 16, 2011, describing her prior encounters with Jacobs and met Brisueno that same day to discuss the letter.

21. During March 16 meeting, Brisueno informed Hudson that he would be reporting her allegations to Internal Affairs ("IA") for investigation. Brisueno asked Hudson to give IA some time to conduct its investigation before filing an EEO complaint. Out of respect for Brisueno, Hudson obliged this request. Brisueno then moved Jacobs from Fifth Platoon to Sixth Platoon.

22. Shortly after Hudson made her initial report to Brisueno, and while waiting for the outcome of the IA investigation, Hudson became aware that many of her fellow officers and supervisors had found out that Hudson had complained about Jacobs.

23. Following Hudson's March 16 meeting with Brisueno, despite the fact that Brisueno had moved Jacobs to the Sixth Platoon, Hudson saw Jacobs on a near-daily basis at the end of Hudson's normal shift and at the beginning of the next shift. These near-daily encounters took place when Hudson was replaced at her assigned post by officers assigned to the Sixth Platoon who were under Jacobs' direct supervision. The encounters continued until Hudson was placed on administrative leave on December 6, 2011, pending her termination as described below.

24. At each encounter between Hudson and Jacobs after Jacobs had been re-assigned to the Sixth Platoon by Brisueno, Jacobs did not speak to Hudson but would routinely try to engage Hudson in a stare-down, thereby causing Hudson to feel extremely uncomfortable and to dread coming to a workplace where she would meet her tormenter.

25. In or around June 2011, on an occasion when Hudson was assigned to do work in an area referred to by PPD officers as "T&E" (short for "Training and Equipment"), which work consisted largely of receiving uniforms needing to be cleaned and returned uniforms after cleaning, Jacobs cornered Hudson when no other persons were present and asked her, sarcastically, "How do you feel now?" or words to that effect.

26. On or about April 26, 2011, Hudson contacted an EEO counselor employed by the Agency and informed that counselor of Jacobs's sexual harassment.

27. On or about June 9, 2011, Hudson filed a Complaint of Discrimination in the Federal Government ("the formal complaint") with the Washington Headquarters Services of the Agency's Equal Employment Opportunity Program ("EEOP-WHS"). The formal complaint, which described Jacobs' sexual harassment, was accepted by the EEOP-WHS on June 29, 2011.

28. Following her filing of the formal complaint, Hudson was subjected not only to continuing harassment from Jacobs but also to retaliation by other Agency personnel.

29. By way of example only, on or about August 9, 2011, Hudson's supervisors did not allow Hudson to be interviewed for a PPD position with the United States Court of Appeals for the Armed Services in Washington, DC, which position Hudson sought to get away from Jacobs; on or about August 25, 2011, Dozier wrote a Letter of Warning claiming that Hudson had left her post without his permission, when in fact Hudson had left her post due to illness, after informing Dozier that she would do so; and on or about September 13, 2011, Hudson was informed that she had not been selected for the position of Administrative Duty Officer, Technical Division, even though Hudson was well-qualified for that position.

30. On or about August 12, 2011, and October 12, 2011, Hudson submitted amendments to the formal complaint ("the amendments") describing the retaliation to which Hudson had been subjected since filing the formal complaint. The amendments were accepted by EEOP-WHS in a letter dated October 2011.

31. On or about December 3, 2011, Hudson called in to report that she was ill. On or about December 5, 2011, Dozier called Hudson and told her if she did not come to work the next day, December 6, 2011, she would be considered absent without leave ("AWOL").

32. Because Hudson still had remaining sick leave, Dozier's demand was unfair, unreasonable, and retaliatory. Nonetheless, as instructed, Hudson reported to work on December 6, 2011, for the 4:30 a.m. to 12:30 p.m. shift. Upon Hudson's arrival, she received a memorandum stating that she would be required to take a urine test by 3:00 p.m. that day.

33. However, at or around 5:00 a.m., before taking the test, and due to her illness, Hudson vomited and urinated on herself while in a Pentagon parking lot. Hudson then asked Dozier if another officer could follow Hudson so that she could change her clothes before going back in the building so as to avoid embarrassment in front of her fellow officers. Dozier denied that request, told Hudson that the Agency had "reasonable suspicion" that Hudson was using illegal drugs, ordered Hudson to return home, and placed Hudson on administrative leave.

34. On or about December 12, 2011, the Agency sent Hudson a letter back-dated to December 6, 2011, formally confirming that Hudson was on administrative leave.

35. On or about April 19, 2012, Hudson was notified in person and in writing that she was to be removed from federal service, effective May 19, 2012, due to her alleged failure to take a drug test on or about December 6, 2011.

36. Prior to filing the formal complaint, Hudson had never been the subject of any adverse employment action by the Agency.

37. To Hudson's knowledge, at least five other women have complained about conduct perpetrated against them by Jacobs while these women were employed by the PPD. The investigator assigned to prepare a Report of Investigation on the formal complaint and the amendments filed by Hudson did not interview any of these women, and the Agency failed to disclose, during the investigation, the related Internal Affairs report. That report contained statements from at least two of these women, one of whom expressly described the working conditions for female officers at PPD as a hostile work environment.

[38-39 reserved.]

## DAMAGES

40. The Agency's discriminatory conduct as described above directly and proximately resulted in a loss of income and related employment benefits for Hudson.

41. The Agency's discriminatory conduct has also caused Hudson to feel humiliated, embarrassed, and degraded, as a consequence of which Hudson has suffered extreme mental anguish and distress continuing to the present day.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

42. More than three years have passed since Hudson filed the formal complaint and amendments. The Agency has failed to take final action on the formal complaint or the amendments. Accordingly, Hudson has the right to sue under 42 U.S.C. § 2000-16(c).

## CAUSES OF ACTION

### Count I–Quid Pro Quo Discrimination

43. Hudson hereby incorporates as through fully set forth herein paragraphs one through 42 of the complaint.

44. The Agency discriminated against Hudson on account of her gender when Jacobs, while acting in a supervisory capacity, repeatedly stated and suggested to Hudson that she would need to gratify his sexual needs in order to advance in the Agency, and not to make enemies of other supervisors. That conduct, which the Agency through Jacobs engaged in intentionally, constituted *quid pro quo* discrimination, in violation of Title VII.

45. As a direct and proximate result of Jacobs' conduct, Hudson suffered the damages set forth above.

WHEREFORE, Hudson requests that the Court grant the following relief to Hudson:

a. Enjoin the Agency from engaging in further gender-based discrimination;

b. Award compensatory damages in the amount of $250,000.00 and punitive damages in the amount of $750,000.00;

c. Award attorney fees and costs of this suit; and

d. Granting such other and further relief as this Court deems fair and just.

### Count II–Hostile Work Environment–Sexual Harassment

46. Hudson hereby incorporates as through fully set forth herein paragraphs one through 45 of the complaint.

47. The Agency discriminated against Hudson by allowing Jacobs, through his chronic sexual harassment of Hudson and other female PPD officers, to create a hostile work environment for Hudson, which the Agency has failed to investigate, take seriously, or attempt to cure. In allowing this hostile work environment to fester, the Agency engaged in intentional discrimination, in violation of Title VII.

48. As a direct and proximate result of that discrimination, Hudson suffered the damages set forth above.

WHEREFORE, Hudson requests that the Court grant the following relief to Hudson:

a. Enjoin the Agency from engaging in further gender-based discrimination;

b. Award compensatory damages in the amount of $250,000.00 and punitive damages in the amount of $750,000.00;

c. Award attorney fees and costs of this suit; and

    d.  Granting such other and further relief as this Court deems fair and just.

### Count III–Hostile Work Environment–Retaliation

49.  Hudson hereby incorporates as through fully set forth herein paragraphs one through 48 of the complaint.

50.  The Agency further discriminated against Hudson by retaliating against Hudson for engaging in protected EEO activity, by taking unfair disciplinary action against Hudson, by not allowing Hudson to transfer to a location outside the Pentagon so that she could be free of Jacobs' routine harassment, failing to conduct a full and fair investigation of the formal complaint and amendments, and ultimately placing Hudson on administrative leave and terminating her, all of which created a hostile work environment for Hudson.  In so doing, the Agency engaged in intentional discrimination, in violation of Title VII.

51.  As a direct and proximate result of that discrimination, Hudson suffered the damages set forth above.

WHEREFORE, Hudson requests that the Court grant the following relief to Hudson:

a.  Enjoin the Agency from engaging in further gender-based discrimination;

b.  Award compensatory damages in the amount of $250,000.00 and punitive damages in the amount of $750,000.00;

c.  Award attorney fees and costs of this suit; and

d.  Granting such other and further relief as this Court deems fair and just.

## JURY DEMAND

Hudson respectfully demands a trial by jury on all claims set forth above.

Respectfully submitted,
/s/
John Christopher Belcher
Attorney for the Plaintiff
D.C. Bar No. 451863
6188 Oxon Hill Road, Suite 811
Oxon Hill, MD 20745
Telephone 301-749-7306
